Theodore H. SUCH, Jr. et al.

v.

STATE of Rhode Island et al.

No. 2007–21–Appeal.

Supreme Court of Rhode Island.

June 26, 2008.

Richard S. Humphrey, Tiverton, for Plaintiff Theodore Such.

John B. Harwood, for Plaintiff Eric Ahlborg.

Michael Field, for Defendant.

Present: WILLIAMS, C.J., GOLDBERG, FLAHERTY, and SUTTELL, JJ.

## O P I N I O N

Justice SUTTELL, for the Court.

"If you like laws and sausage, you should never watch either one being made."[1] Otto von Bismark's laconic observation is apropos to this appeal in which we are asked to consider two legislative acts passed in the waning days of the 2005–2006 session of the General Assembly.

The State of Rhode Island appeals from a declaratory judgment entered in favor of plaintiffs, Theodore H. Such, Jr., Eric Ahlborg, and Robert MacDonald. The central issue before us focuses on the degree and type of penalty available against persons who refuse to submit to chemical tests when law enforcement officers have reasonable grounds to suspect they have been operating a motor vehicle under the influence of liquor or drugs.

Public Laws 2006, ch. 232 (chapter 232 or the refusal bill), and P.L. 2006, ch. 246 (chapter 246 or the budget bill), were signed by the Governor two days apart and each made changes to the same statutory section, G.L. 1956 § 31–27–2.1 entitled "Refusal to submit to chemical test" (the refusal statute). Chapter 232 added language to the refusal statute that authorized increased penalties for refusal to submit to a chemical test. Chapter 246, signed two days after chapter 232, inserted a new subsection in the refusal statute that imposed a $200 assessment. P.L. 2006, ch. 246, art. 10, § 1. Chapter 246, however, did not include the newly enacted amendments to the refusal statute set forth in chapter 232; instead, it republished the refusal statute as it had existed before the enactment of chapter 232. The plaintiffs contend chapter 246 repealed the operative language in chapter 232 that imposed increased penalties for refusal to submit to a chemical test. For the reasons set forth in this opinion, we reverse the judgment of the Superior Court.

## I

### Facts and Procedural History

The sequence of legislative events is not disputed by the parties. On January 3, 2006, members of the House of Representatives introduced 2006–H 6700, the refusal bill, which proposed amendments to the refusal statute. Specifically, the refusal

---

**1.** This quotation, or one of its many variants, is generally attributed to Otto von Bismark. An earlier, but decidedly less gracious version: "Laws, like sausage, cease to inspire respect in proportion as we know how they are made" is credited to Vermont lawyer and author John Godfrey Saxe in an 1869 lecture. Ralph Keyes, *The Quote Verifier* 188 (2006).

bill in its final form made the following changes to the refusal statute: it allowed district court judges, in addition to traffic tribunal judges, to impose penalties; the range for a license revocation increased from a span of three to six months to a span of six months to a year; second and third offenders became subject to criminal liability, increased fines, and more community service;[2] and the Attorney General was required to submit information on the charging and disposition of cases brought under §§ 31–27–1 to 31–27–2.8 and report on the number of related fatalities in an Annual Impaired Driving Report. The refusal bill, designated as "2006–H 6700 Substitute B, as amended," was passed by the Senate on June 23, 2006, and by the House, in concurrence, on June 24. The House transmitted the bill to the Governor on the same day, June 24, and the Governor signed it into law on June 28, 2006.[3]

Meanwhile, on February 8, 2006, members of the House introduced the budget bill, 2006–H 7120, to make appropriations for the fiscal year ending June 30, 2007. The budget bill contained forty-one articles concerning many areas of state government; one of the provisions, Article 10, sought to add a new subsection to the refusal statute but otherwise left it untouched. Specifically, Article 10 reproduced the language of the refusal statute verbatim as it then existed, adding only a new subsection, § 31–27–2.1(b)(6), which said:

> "In addition to any other fines and highway safety assessments, a two hundred dollar ($200) assessment shall be paid by any person found in violation of this section to support the department of health's chemical testing programs outlined in § 31–27–2(4), which shall be deposited as general revenues, not restricted receipts."

The budget bill, marked as "2006–H 7120 Substitute A," was passed by the House on June 19, 2006. The Senate passed it in concurrence on June 23, 2006, and it was transmitted to the Governor on June 29. The Governor signed the budget bill into law on June 30, and it became effective on July 1, 2006.[4]

The three plaintiffs in this case were stopped by police officers and suspected of operating motor vehicles under the influence. On September 25, 2006, a North Kingstown police officer stopped Theodore H. Such, Jr., and he was charged with refusing to submit to a chemical test and driving under the influence of liquor or drugs. The North Kingstown police cited the new penalties set forth in the refusal bill (chapter 232) to Mr. Such.[5] On Sep-

---

**2.** For second offenders within a five-year period, the refusal bill authorized prison time of up to six months, changed the range of monetary fine from $300 to $500 to between $600 and $1,000, and ordered the performance of 60 to 100 hours of community service. For third offenders within a five-year period, the refusal bill authorized prison time of not more than one year, changed the fine range from $400 to $500 to between $800 to $1,000, ordered a minimum of 100 hours of community service, and changed the maximum allowable time for the suspension of the operator's license from three years to five years. P.L. 2006, ch. 232, § 1.

**3.** A copy of 2006–H 6700 Substitute B, as amended (the refusal bill) is appended to this opinion as Appendix A.

**4.** A copy of Article 10 of 2006–H 7120 Substitute A is appended to this opinion as Appendix B.

**5.** General Laws 1956 § 31–27–2.1(b) provides in part that a judge shall impose penalties upon receipt of a report of a law enforcement officer stating, *inter alia,* that the arrested person "had been informed of the penalties incurred as a result of noncompliance with this section" before he or she refused to submit to a chemical test.

tember 28, 2006, Eric Ahlborg was stopped by a Warwick police officer and subsequently charged with refusing to submit to a chemical test. Mr. Ahlborg was informed of the new penalties in the refusal bill. On October 1, 2006, Robert MacDonald was charged with refusing to submit to a chemical test by the West Warwick police, and he also was presented with the new penalties in the refusal bill.

Each plaintiff appeared before the Rhode Island Traffic Tribunal in November 2006. When Mr. Such appeared before the tribunal, the magistrate judge granted his motion to continue trial so that Mr. Such could seek a declaratory judgment and other relief in the Superior Court relating to the alleged incongruities between the budget bill and the refusal bill. In a separate proceeding, the tribunal granted similar relief to Mr. Ahlborg. Mr. MacDonald's case, by contrast, proceeded to trial, after which the magistrate judge imposed penalties authorized by the refusal statute, including a $200 fine, a $500 highway safety assessment, a six-month suspension of his license to operate,[6] participation in a remedial program, and ten hours of community service.

On November 8, 2006, Mr. Such filed a complaint for declaratory judgment, equitable relief, and class action in the Superior Court. In pertinent part, Mr. Such complained that the police incorrectly presented him with the increased penalties set forth in the refusal bill. Mr. Such contended that the subsequent enactment of the budget bill negated the statutory

amendments made by the refusal bill. Mr. Ahlborg and Mr. MacDonald each moved separately to intervene; the Superior Court granted their motions on December 18, 2006 and January 4, 2007, respectively.

The state and plaintiffs filed cross-motions for summary judgment.[7] The plaintiffs argued that the budget bill either amended the refusal bill or implicitly repealed it such that the increased penalties in the refusal bill had no legal force after the enactment of the budget bill. The state, on the other hand, asserted that no conflict existed between the refusal bill and the budget bill and that the budget bill did not repeal the newly enacted provisions in the refusal bill.

The Superior Court heard the cross-motions for summary judgment on January 16, 2007. After oral argument, the Superior Court ruled from the bench that the budget bill and the refusal bill were "two contradictory statutes, two statutes which are not reconcilable."[8] The trial justice stated that a "big mistake was made relative to this legislation" and that "it should be abundantly clear to anybody that there is great confusion here." The court explained that "someone dropped the ball" and that "it is not for this Court to speculate or guess about what was going on" with the enactment of the budget bill two days after the refusal bill. The trial justice further emphasized that the two statutes should be looked at "not from the point of view of lawyers," but from "the point of view of the people operating vehicles on our state highways who are subject

6. The magistrate judge stayed suspension of Mr. MacDonald's driver's license until January 30, 2007.

7. Mr. Ahlborg filed a motion for summary judgment on January 4, 2007, and it was subsequently joined by Mr. Such and Mr. MacDonald.

8. At the outset of the bench decision, the trial justice stated that the budget bill "passed in the House on June 19th but was not passed in the Senate until June 29th, on which date it went to the governor who then signed it on June 30th." We note that the parties do not dispute that the budget bill passed the Senate on June 23, 2006, not June 29.

to this or to these statutes[.]" So viewed, the court explained that plaintiffs, or other persons similarly situated, would be forced to speculate about possible criminal penalties if they read the budget bill and the refusal bill concurrently.

The court's ruling employed several tenets of statutory construction. The trial justice noted that the refusal bill criminalized the refusal to submit to a chemical test while the budget bill was a civil statute, and that penal statutes must be construed strictly in favor of those against whom the penalty is sought to be imposed. The court further reasoned that when a conflict exists between two statutes, the last in time controls; and it also explained that the General Assembly is presumed to have intended every word or provision of a statute to express a significant meaning. Applying these principles to the facts of the case, the trial justice concluded that he could not harmonize the substantive language of the refusal bill and the budget bill. The court emphasized that the budget bill was signed into law after the refusal bill and that the budget bill reproduced the statutory language in the refusal statute as it existed before the enactment of the refusal bill. The court concluded, therefore, that the budget bill repealed the refusal bill by implication, and that the refusal bill "had vitality only until such time as the governor signed into effect the so-called [budget bill]."[9] Accordingly, the Superior Court granted plaintiffs' motion for summary judgment on the complaint for declaratory judgment. On January 18, 2007, the Superior Court entered a written order to the same effect.[10]

The Superior Court entered judgment on January 18, 2007, and the state timely appealed. On February 16, 2007, this Court granted the state's motion for stay pending appeal. Additional facts will be supplied as needed.

## II

### Standard of Review

 The Uniform Declaratory Judgments Act, G.L. 1956 chapter 30 of title 9, governs the issuance and review of declaratory judgments by Rhode Island courts. "In that statute, the Legislature determined that '[a]ll orders, judgments, and decrees under this chapter may be reviewed as other orders, judgments, and decrees.'" *Casco Indemnity Co. v. O'Connor*, 755 A.2d 779, 781–82 (R.I.2000) (quoting § 9–30–7). When presented with questions of statutory interpretation, as we are in this case, this Court engages in a *de novo* review. *State v. LaRoche*, 925 A.2d 885, 887 (R.I.2007). Further, "[t]his Court reviews the granting of a motion for summary judgment on a *de novo* basis." *Lucier v. Impact Recreation, Ltd.*, 864 A.2d 635, 638 (R.I.2005); *see also Travelers Property and Casualty Corp. v. Old Republic Insurance Co.*, 847 A.2d 303, 307 (R.I.2004) ("In reviewing the parties' cross-motions for summary judgment, we examine the matter *de novo*.").

## III

### Discussion

 When construing statutes, this Court's role is "to determine and effectu-

9. At the conclusion of the bench decision, the state moved for a stay of the ruling, which the Superior Court denied.

10. The January 18, 2007 order stated in pertinent part: "[the budget bill] that amended the [refusal statute] * * * that was passed by the Legislature and signed into law by the Gover- nor on June 30, 2006, repealed by implication [the refusal bill]," that "[the budget bill] * * * is the controlling statute," and that "the Plaintiff's Motion for Summary Judgment is granted in favor of Theodore H. Such, Jr.[,] Eric Ahlborg and Robert MacDonald."

ate the Legislature's intent and to attribute to the enactment the meaning most consistent with its policies or obvious purposes." *Brennan v. Kirby*, 529 A.2d 633, 637 (R.I.1987). "It is well settled that when the language of a statute is clear and unambiguous, this Court must interpret the statute literally and must give the words of the statute their plain and ordinary meanings." *Moore v. Ballard*, 914 A.2d 487, 490 (R.I.2007) (quoting *Accent Store Design, Inc. v. Marathon House, Inc.*, 674 A.2d 1223, 1226 (R.I.1996)). It is an equally well-settled principle that "statutes relating to the same subject matter should be considered together so that they will harmonize with each other and be consistent" with their general objective scope. *State ex rel. Webb v. Cianci*, 591 A.2d 1193, 1203 (R.I.1991); *see also Horn v. Southern Union Co.*, 927 A.2d 292, 295 (R.I.2007). Such statutes are considered to be *in pari materia*, which stands for the simple proposition that "statutes on the same subject * * * are, when enacted by the same jurisdiction, to be read in relation to each other." *Horn*, 927 A.2d at 294 n. 5 (quoting Reed Dickerson, *The Interpretation and Application of Statutes* 233 (1975)).

██ This Court's method of statutory construction involves a "practice of construing and applying apparently inconsistent statutory provisions in such a manner so as to avoid the inconsistency." *Kells v. Town of Lincoln*, 874 A.2d 204, 212 (R.I. 2005) (quoting *Montaquila v. St. Cyr*, 433 A.2d 206, 214 (R.I.1981)). In such cases, "courts should attempt to construe two statutes that are in apparent conflict so that, if at all reasonably possible, both statutes may stand and be operative." *Shelter Harbor Fire District v. Vacca*, 835 A.2d 446, 449 (R.I.2003) (quoting *Providence Electric Co. v. Donatelli Building Co.*, 116 R.I. 340, 344, 356 A.2d 483, 486

(1976)). We engage in this exercise to give effect "to the apparent object and purpose of the Legislature." *Merciol v. New England Telephone and Telegraph Co.*, 110 R.I. 149, 153, 290 A.2d 907, 910 (1972). As this Court has explained, " 'repeals by implication are not favored by the law,' " and "[o]nly when the two statutory provisions are *irreconcilably repugnant* will a repeal be implied and the last-enacted statute be preferred." *McKenna v. Williams*, 874 A.2d 217, 241 (R.I.2005) (quoting *Berthiaume v. School Committee of Woonsocket*, 121 R.I. 243, 248–49, 397 A.2d 889, 893 (1979)).

██ Another well-recognized rule of statutory construction states that if "the same legislative session enacts two or more acts on the same subject they are presumed to have been actuated by the same policy and intended to have effect together." 1A Norman J. Singer, *Sutherland Statutory Construction* § 23:18 at 523 (6th ed. 2002). "The rules of construction and interpretation of acts in pari materia apply with singular force to enactments promulgated by the same legislative body, and this strengthens the presumption against implied repeals." *Id.*; *see, e.g., Niles v. Iowa District Court For Polk County*, 683 N.W.2d 539, 541 (Iowa 2004); *State ex rel. Dix v. Board of Education*, 224 Kan. 38, 578 P.2d 692, 694 (1978); *Kelly v. Marylanders for Sports Sanity, Inc.*, 310 Md. 437, 530 A.2d 245, 262 (1987); *State v. Knapp*, 843 S.W.2d 345, 347 (Mo. 1992); *Mimkon v. Ford*, 66 N.J. 426, 332 A.2d 199, 203 (1975); *State v. Davis*, 134 N.M. 172, 74 P.3d 1064, 1069 (2003); *Washington v. Commonwealth*, 272 Va. 449, 634 S.E.2d 310, 316 (2006); *State v. Chapman*, 140 Wash.2d 436, 998 P.2d 282, 290 (2000); *Courtney v. State Department of Health of West Virginia*, 182 W.Va. 465, 388 S.E.2d 491, 496 (1989).

■ Applying these principles to the case at bar, this Court concludes that the General Assembly did not intend the budget bill to negate the statutory amendments contained in the refusal bill; instead, the General Assembly intended for the amendatory language in both bills to become operative in the refusal statute. To hold that the budget bill repealed the refusal bill, as plaintiffs contend, would require this Court to determine that the pre-refusal bill language republished in the budget bill implicitly or expressly repealed the refusal bill. We decline to reach this result for several reasons.

Most importantly, the budget bill and the refusal bill were passed in the same legislative session—indeed, one day apart by the General Assembly—and they address the same subject matter. Both pieces of legislation relate to the refusal to submit to a chemical test. As such, this Court presumes they were actuated by the same policy and that the General Assembly intended them to have effect together. The budget bill added a $200 assessment to the refusal statute "to support the department of health's chemical testing programs * * * which shall be deposited as general revenues, not restricted receipts." P.L. 2006, ch. 246, art. 10, § 1 (§ 31–27–2.1(b)(6)). The refusal bill, by contrast, inserted several new provisions that increased penalties and fines and added other language to assist enforcement. The obvious purpose of the budget bill, taken from the meaning of the words that appear in its language, is to increase revenue for the Department of Health, whereas the manifest purpose of the refusal bill is to add increased penalties to deter the operation of a motor vehicle while under the influence of liquor or drugs. Viewed in this light, the budget bill and the refusal bill are not irreconcilably repugnant and they easily can be harmonized with each other. A reasonable construction, which gives effect to the intent of the General Assembly, makes operative the amendatory language in both bills vis-à-vis the refusal statute.

Secondly, although the Governor signed the refusal bill first, the General Assembly passed the budget bill one day before it passed the refusal bill. The plaintiffs argue that the budget bill expressly repealed the refusal bill. Yet, at the time the General Assembly passed the budget bill, it had not taken final action on the refusal bill, much less had the refusal bill been enacted into law. Thus, at the point in the legislative process when both the House and the Senate passed the budget bill, said bill contained the correct language of the refusal statute as it then existed. We do not believe the General Assembly, having already passed the budget bill, was required to reconsider and amend it merely to reflect the amendments that later became effective when the Governor signed the refusal bill, provided the two enactments can be harmonized and both given effect. *See State v. Smith,* 136 N.M. 372, 98 P.3d 1022, 1028 (2004).

■ The timing of the Governor's signature is irrelevant under the specific set of facts before us. As plaintiffs point out, the "Rhode Island Constitution vests legislative authority exclusively in the General Assembly." Article 5 of the Rhode Island Constitution commands that the "powers of the government shall be distributed into three separate and distinct departments: the legislative, executive and judicial." Further, our constitution states that the "legislative power, under this Constitution, shall be vested in two houses, the one to be called the senate, the other the house of representatives." R.I. Const. art. 6, sec. 2. Clearly the legislative power includes the power to enact, amend, and repeal statutes. 1A *Sutherland Statutory Construc-*

*tion* § 22:2 at 243 ("The power to amend statutes belongs exclusively to the legislature."); *id.* § 23:3 at 439 ("The efficacy of the legislature depends upon the possession of the power to repeal the existing law, for without this attribute the power to enact would be a nullity * * *.").

It is true, of course, that legislation passed by both houses "shall be presented to the Governor," and "[i]f the governor approve[s] it the governor shall sign it, and thereupon it shall become operative." R.I. Const. art. 9, sec. 14. If the Governor disproves of legislation, he can veto it or take other action consistent with our constitution. *Id.* This constitutional directive, however, does not give the Governor the power to repeal one of two bills solely based on the chronological order he signs legislation when each bill has passed the General Assembly but neither has received his signature. Moreover, our task in construing statutes is to give effect to legislative intent, not gubernatorial intent. *See People ex rel. Schlaeger v. Mattes,* 396 Ill. 348, 71 N.E.2d 690, 693 (1947) ("We believe the intention of the legislature can more nearly be ascertained from its last expression rather than from the order in which the bills are signed or not signed by the Governor."). In this case, as we previously have discussed, the budget bill and the refusal bill are not irreconcilably repugnant, and we thus are able to give effect to both.

We also note that the rule of lenity does not apply to the criminal penalties in the refusal bill. "The policy of lenity applies to the construction of criminal statutes and requires that we adopt the less harsh of two possible meanings when faced with an ambiguous criminal statute." *State v. Day,* 911 A.2d 1042, 1047–48 n. 6 (R.I.2006). The plaintiffs rely upon *In re Advisory Opinion to the Governor,* 492 A.2d 133 (R.I.1985), in support of the contention that the rule of lenity applies here. In that case, the General Assembly amended a statute but omitted several words that were contained in the existing statute. Neither did the General Assembly "strike through" the words at issue, as was required by the rules of each house. *Id.* This Court declined to read the omitted words back into the statute, reasoning that "the statute in question is a penal statute, and we are of the opinion that it cannot be enforced even if the above provisions were omitted in violation of the House and Senate rules in effect at the time of the amendment." *Id.*

The rule of lenity, however, applies only when the meaning of a criminal statute is ambiguous. *See State v. Oliveira,* 882 A.2d 1097, 1110 (R.I.2005). In other words, the rule of lenity "is inapplicable when the legislative intent is clear." *State v. Robalewski,* 418 A.2d 817, 826 (R.I.1980). In the case at bar, the legislative intent of both the refusal bill and the budget bill is quite clear. Our task, rather, is to attempt to harmonize the two enactments such that effect may be given to both. Accordingly, the rule of lenity does not operate to strike the penalty provisions in the refusal bill from the refusal statute.

Finally, this Court emphasizes that it does not rely in reaching its decision upon the various indicia of legislative intent that the parties advanced. "There is no recorded legislative history in Rhode Island from which to ascertain legislative intent." *Laird v. Chrysler Corp.,* 460 A.2d 425, 428 (R.I.1983). To the extent that this Court examines the circumstances surrounding the enactment of a statute, it engages in this exercise only when the statute is ambiguous. *First Republic Corp. of America v. Norberg,* 116 R.I. 414, 418, 358 A.2d 38, 41 (1976). "When the

language of a statute expresses a clear and sensible meaning, this [C]ourt will not look beyond it." *Id.* This Court, however, does not look to the public statements of officials, the political leanings of the members that introduced the legislation, the meaning of gubernatorial signing ceremonies, or the actions of the compiler in the Law Revision Office. Even the House or Senate's adherence or failure to follow its own internal rules carries little weight for the purposes of statutory construction. *See In re Advisory Opinion to the Governor,* 492 A.2d at 133. In the case before us, we are of the opinion that the General Assembly clearly intended to give effect to the increased penalty provisions in the refusal bill, as well as to the $200 assessment set forth in the budget bill.

## IV

### Conclusion

For the reasons stated in this opinion, we reverse the judgment of the Superior Court and remand the papers thereto.

Justice ROBINSON did not participate.

# APPENDIX A

PUBLIC LAWS
2006 -- H 6700 SUBSTITUTE B AS AMENDED CHAPTER
LC00154/SUB B AS AMENDED AS AMENDED 06-232
JT COMM. LEGISLATIVE SERVICE
LAW REVISION OFFICE

## STATE OF RHODE ISLAND

### IN GENERAL ASSEMBLY

### JANUARY SESSION, A.D. 2006

### AN ACT

### RELATING TO MOTOR VEHICLE OFFENSES

Introduced By: Representatives O'Neill, Ginaitt, Church, Kilmartin, and Jackson

Date Introduced: January 03, 2006

Referred To: House Judiciary

It is enacted by the General Assembly as follows:

SECTION 1. Section 31-27-2.1 of the General Laws in Chapter 31-27 entitled "Motor Vehicle Offenses" is hereby amended to read as follows:

31-27-2.1. Refusal to submit to chemical test. -- (a) Any person who operates a motor vehicle within this state shall be deemed to have given his or her consent to chemical tests of his or her breath, blood, and/or urine for the purpose of determining the chemical content of his or her body fluids or breath. No more than two (2) complete tests, one for the presence of intoxicating liquor and one for the presence of toluene or any controlled substance, as defined in section 21-28-1.02(7), shall be administered at the direction of a law enforcement officer having reasonable grounds to believe the person to have been driving a motor vehicle within this state while under the influence of intoxicating liquor, toluene, or any controlled substance, as defined in chapter 28 of title 21; or any combination of these. The director of the department of health is empowered to make and file with the secretary of state, regulations which prescribe the techniques and methods of chemical analysis of the person's body fluids or breath and the qualifications and certification of individuals authorized to administer the testing and analysis.

(b) If a person for religious or medical reasons cannot be subjected to blood tests, the person may file an affidavit with the division of motor vehicles stating the reasons why he or she cannot be required to take blood tests, and a notation to this effect shall be made on his or her license. If that person is asked to submit to chemical tests as provided under this chapter, the person shall only be required to submit to chemical tests of his or her breath or urine. When a

person is requested to submit to blood tests, only a physician or registered nurse or a medical technician certified under regulations promulgated by the director of the department of health may withdraw blood for the purpose of determining the alcoholic content in it. This limitation shall not apply to the taking of breath or urine specimens. The person tested shall be permitted to have a physician of his or her own choosing and at his or her own expense administer chemical tests of his or her breath, blood, and/or urine in addition to the tests administered at the direction of a law enforcement officer. If a person having been placed under arrest refuses upon the request of a law enforcement officer to submit to the tests, as provided in section 31-27-2, none shall be given, but a judge of the traffic tribunal or district court judge, upon receipt of a report of a law enforcement officer: that he or she had reasonable grounds to believe the arrested person had been driving a motor vehicle within this state under the influence of intoxicating liquor, toluene, or any controlled substance, as defined in chapter 28 of title 21, or any combination of these; that the person had been informed of his or her rights in accordance with section 31-27-3; that the person had been informed of the penalties incurred as a result of noncompliance with this section; and that the person had refused to submit to the tests upon the request of a law enforcement officer; shall promptly order that the person's operator's license or privilege to operate a motor vehicle in this state be immediately suspended and that the person's license be surrendered within five (5) days of notice of suspension. A traffic tribunal judge or a district court judge pursuant to the terms of subsection (c) of this section shall order as follows:

(1) Impose for the first violation a fine in the amount of two hundred dollars ($200) to five hundred dollars ($500) and shall order the person to perform ten (10) to sixty (60) hours of public community restitution. The person's driving license in this state shall be suspended for a period of ~~three (3) months to~~ six (6) months to one year. The traffic tribunal judge shall require attendance at a special course on driving while intoxicated or under the influence of a controlled substance and/or alcohol or drug treatment for the individual.

(2) ~~Impose for~~ Every person convicted for a second violation within a five (5) year period shall be guilty of a misdemeanor, shall be imprisoned for not more than six (6) months and shall pay a fine in the amount of ~~three hundred dollars ($300) to five~~ six hundred dollars ~~($500)~~($600) to one thousand dollars ($1,000), order the person to perform sixty (60) to one hundred (100) hours of public community restitution, and the person's driving license in this state shall be suspended for a period of one year to two (2) years. The ~~traffic tribunal~~ judge shall require alcohol and/or drug treatment for the individual.

(3) ~~Impose for~~ Every person convicted for a third or subsequent violation within a five (5) year period ~~a fine of four hundred dollars ($400) to~~ shall be guilty of a misdemeanor and shall

be imprisoned for not more than one year, fined ~~five~~ eight hundred dollars (~~$500~~)($800) to one thousand dollars ($1,000), order the person to perform not less than one hundred (100) hours of public community restitution, and the person's operator's license in this state shall be suspended for a period of two (2) years to ~~three~~ five (~~3~~)(5) years. The ~~traffic tribunal~~ judge shall require alcohol or drug treatment for the individual. Provided, that prior to the reinstatement of a license to a person charged with a third or subsequent violation within a three (3) year period, a hearing shall be held before a ~~traffic tribunal~~ judge. At the hearing the ~~traffic tribunal~~ judge shall review the person's driving record, his or her employment history, family background, and any other pertinent factors that would indicate that the person has demonstrated behavior which warrants the reinstatement of his or her license.

(4) For purposes of determining the period of license suspension, a prior violation shall constitute any charge brought and sustained under the provisions of this section or section 31-27-2.

(5) In addition to any other fines, a highway safety assessment of five hundred dollars ($500) shall be paid by any person found in violation of this section, the assessment to be deposited into the general fund. The assessment provided for by this subsection shall be collected from a violator before any other fines authorized by this section.

(6) No fines, suspensions, assessments, alcohol or drug treatment programs, course on driving while intoxicated or under the influence of a controlled substance, or public community restitution provided for under this section, can be suspended.

(c) Upon suspending or refusing to issue a license or permit as provided in subsection (a) of this section, the traffic tribunal or district court shall immediately notify the person involved in writing, and upon his or her request, within fifteen (15) days shall afford the person an opportunity for a hearing as early as practical upon receipt of a request in writing. Upon a hearing the ~~traffic tribunal~~ judge may administer oaths and may issue subpoenas for the attendance of witnesses and the production of relevant books and papers. If the ~~traffic tribunal~~ judge finds after the hearing that: (1) the law enforcement officer making the sworn report had reasonable grounds to believe that the arrested person had been driving a motor vehicle within this state while under the influence of intoxicating liquor, toluene, or any controlled substance, as defined in chapter 28 of title 21, or any combination of these; (2) the person while under arrest refused to submit to the tests upon the request of a law enforcement officer; (3) the person had been informed of his or her rights in accordance with section 31-27-3; and (4) the person had been informed of the penalties incurred as a result of noncompliance with this section; the ~~traffic tribunal~~ judge shall sustain the violation. The ~~traffic tribunal~~ judge shall then impose the penalties set forth in subsection (b) of

■

this section. Action by the ~~traffic tribunal~~ judge must be taken within seven (7) days after the hearing, or it shall be presumed that the ~~traffic tribunal~~ judge has refused to issue his or her order of suspension.

(d) For the purposes of this section, any test of a sample of blood, breath, or urine for the presence of alcohol which relies in whole or in part upon the principle of infrared light absorption is considered a chemical test.

(e) If any provision of this section or the application of any provision shall for any reason be judged invalid, the judgment shall not affect, impair, or invalidate the remainder of the section, but shall be confined in this effect to the provisions or application directly involved in the controversy giving rise to the judgment.

SECTION 2. Chapter 31-27 of the General Laws entitled "Motor Vehicle Offenses" is hereby amended by adding thereto the following section:

31-27-3.1. Annual Impaired Driving Report. -- (a) The attorney general, with the cooperation of state and municipal police departments, with the district court, the traffic tribunal and the department of transportation shall annually, on or before, the 30th day of April of each year, prepare a written report to the general assembly identifying all cases where an individual is charged with an offense under section 31-27-1 through section 31-27-2.8 of the general laws. The report shall include the numbers of cases charged under each statute, as well as the disposition in each case charged, if any.

(b) In addition to the number of cases charged and their disposition, the report shall identify the number of cases which are filed with dual charges of driving under the influence under section 31-27-1 and refusal to submit to a chemical test under section 31-27-2, and the disposition of each of these dual charges.

(c) The report shall also identify, in any alcohol or drug related fatality charged under section 31-27-1 through 31-27-8 of the general laws, whether the driver of the motor vehicle, a passenger in the motor vehicle or a pedestrian was identified by law enforcement, the medical examiner or any other entity as being under the influence of alcohol or drugs in the fatal accident.

(d) The attorney general shall promulgate any rule or regulation necessary to implement the provisions of this section.

SECTION 3. This act shall take effect upon passage.

LC00154/SUB B

**PUBLIC LAWS**
**CHAPTER**
*06-232*

JT COMM. LEGISLATIVE SERVICES
LAW REVISION OFFICE

2006 — H 6700
SUBSTITUTE B

AS AMENDED

### AN ACT

#### RELATING TO MOTOR VEHICLE OFFENSES

LC00154/SUB B

Presented by

# APPENDIX B

## ARTICLE 10

### RELATING TO SUBMIT TO CHEMICAL TEST

SECTION 1. Section 31-27-2 of the General Laws in Chapter 31-27 entitled "Motor and Other vehicles" is hereby amended to read as follows:

31-27-2.1. Refusal to submit to chemical test. – (a) Any person who operates a motor vehicle within this state shall be deemed to have given his or her consent to chemical tests of his or her breath, blood, and/or urine for the purpose of determining the chemical content of his or her body fluids or breath. No more than two (2) complete tests, one for the presence of intoxicating liquor and one for the presence of toluene or any controlled substance, as defined in § 21-28-1.02(7), shall be administered at the direction of a law enforcement officer having reasonable grounds to believe the person to have been driving a motor vehicle within this state while under the influence of intoxicating liquor, toluene, or any controlled substance, as defined in chapter 28 of title 21, or any combination of these. The director of the department of health is empowered to make and file with the secretary of state, regulations which prescribe the techniques and methods of chemical analysis of the person's body fluids or breath and the qualifications and certification of individuals authorized to administer the testing and analysis.

(b) If a person for religious or medical reasons cannot be subjected to blood tests, the person may file an affidavit with the division of motor vehicles stating the reasons why he or she cannot be required to take blood tests, and a notation to this effect shall be made on his or her license. If that person is asked to submit to chemical tests as provided under this chapter, the person shall only be required to submit to chemical tests of his or her breath or urine. When a person is requested to submit to blood tests, only a physician or registered nurse or a medical technician certified under regulations promulgated by the director of the department of health may withdraw blood for the purpose of determining the alcoholic content in it. This limitation shall not apply to the taking of breath or urine specimens. The person tested shall be permitted to have a physician of his or her own choosing and at his or her own expense administer chemical tests of his or her breath, blood, and/or urine in addition to the tests administered at the direction of a law enforcement officer. If a person having been placed under arrest refuses upon the request of a law enforcement officer to submit to the tests, as provided in § 31-27-2, none shall be given, but a judge of the traffic tribunal, upon receipt of a report of a law enforcement officer: that he or

she had reasonable grounds to believe the arrested person had been driving a motor vehicle within this state under the influence of intoxicating liquor, toluene, or any controlled substance, as defined in chapter 28 of title 21, or any combination of these; that the person had been informed of his or her rights in accordance with § 31-27-3; that the person had been informed of the penalties incurred as a result of noncompliance with this section; and that the person had refused to submit to the tests upon the request of a law enforcement officer; shall promptly order that the person's operator's license or privilege to operate a motor vehicle in this state be immediately suspended and that the person's license be surrendered within five (5) days of notice of suspension. A traffic tribunal judge pursuant to the terms of subsection (c) of this section shall order as follows:

(1) Impose for the first violation a fine in the amount of two hundred dollars ($200) to five hundred dollars ($500) and shall order the person to perform ten (10) to sixty (60) hours of public community restitution. The person's driving license in this state shall be suspended for a period of three (3) months to six (6) months. The traffic tribunal judge shall require attendance at a special course on driving while intoxicated or under the influence of a controlled substance and/or alcohol or drug treatment for the individual.

(2) Impose for a second violation within a five (5) year period a fine in the amount of three hundred dollars ($300) to five hundred dollars ($500), and the person's driving license in this state shall be suspended for a period of one year to two (2) years. The traffic tribunal judge shall require alcohol and/or drug treatment for the individual.

(3) Impose for a third or subsequent violation within a five (5) year period a fine of four hundred dollars ($400) to five hundred dollars ($500), and the person's operator's license in this state shall be suspended for a period of two (2) years to three (3) years. The traffic tribunal judge shall require alcohol or drug treatment for the individual: Provided, that prior to the reinstatement of a license to a person charged with a third or subsequent violation within a three (3) year period, a hearing shall be held before a traffic tribunal judge. At the hearing the traffic tribunal judge shall review the person's driving record, his or her employment history, family background, and any other pertinent factors that would indicate that the person has demonstrated behavior which warrants the reinstatement of his or her license.

(4) For purposes of determining the period of license suspension, a prior violation shall constitute any charge brought and sustained under the provisions of this section or § 31-27-2.

(5) In addition to any other fines, a highway safety assessment of five hundred dollars ($500) shall be paid by any person found in violation of this section, the assessment to be deposited into the general fund. The assessment provided for by this subsection shall be collected

from a violator before any other fines authorized by this section.

(6) In addition to any other fines and highway safety assessments, a two-hundred dollar ($200) assessment shall be paid by any person found in violation of this section to support the department of health's chemical testing programs outlined in §31-27-2 (4), which shall be deposited as general revenues, not restricted receipts.

(6) (7) No fines, suspensions, assessments, alcohol or drug treatment programs, course on driving while intoxicated or under the influence of a controlled substance, or public community restitution provided for under this section, can be suspended.

(c) Upon suspending or refusing to issue a license or permit as provided in subsection (a) of this section, the traffic tribunal shall immediately notify the person involved in writing, and upon his or her request, within fifteen (15) days shall afford the person an opportunity for a hearing as early as practical upon receipt of a request in writing. Upon a hearing the traffic tribunal judge may administer oaths and may issue subpoenas for the attendance of witnesses and the production of relevant books and papers. If the traffic tribunal judge finds after the hearing that: (1) the law enforcement officer making the sworn report had reasonable grounds to believe that the arrested person had been driving a motor vehicle within this state while under the influence of intoxicating liquor, toluene, or any controlled substance, as defined in chapter 28 of title 21, or any combination of these (2) the person while under arrest refused to submit to the tests upon the request of a law enforcement officer; (3) the person had been informed of his or her rights in accordance with § 31-27-3; and (4) the person had been informed of the penalties incurred as a result of noncompliance with this section; the traffic tribunal judge shall sustain the violation. The traffic tribunal judge shall then impose the penalties set forth in subsection (b) of this section. Action by the traffic tribunal judge must be taken within seven (7) days after the hearing, or it shall be presumed that the traffic tribunal judge has refused to issue his or her order of suspension.

(d) For the purposes of this section, any test of a sample of blood, breath, or urine for the presence of alcohol which relies in whole or in part upon the principle of infrared light absorption is considered a chemical test.

(e) If any provision of this section or the application of any provision shall for any reason be judged invalid, the judgment shall not affect, impair, or invalidate the remainder of the section, but shall be confined in this effect to the provisions or application directly involved in the controversy giving rise to the judgment.

SECTION 2. This article shall take effect on July 1, 2006.

Art10
Relating To Submit to Chemical Test

PUBLIC LAWS
CHAPTER

06-246

JT COMM. LEGISLATIVE SERVICES
LAW REVISION OFFICE

2006 — H 7120
SUBSTITUTE A

RE-REFERRED

AN ACT

MAKING APPROPRIATIONS FOR THE SUPPORT OF THE STATE FOR THE FISCAL YEAR
ENDING JUNE, 30, 2007

LC02076/SUB A

Presented by

EXECUTIVE DEPARTMENT,
JUN 2 9 2006
Received JUN 3 0 2006
APPROVED
GOVERNOR

IN THE SENATE
THE COMMITTEE ON
FINANCE
RECOMMENDS THE PASSAGE
IN CONCURRENCE OF

IN THE SENATE
Order No. to be placed on the
CALENDAR
JUN 2 3 2006
Reading Clerk

IN THE SENATE
READ AND PASSED AS AMENDED
IN CONCURRENCE
JUN 2 3 2006
Reading Clerk

READ AND PASSED IN CONCURRENCE
TRANSMITTED TO THE GOVERNOR
JUN 2 9 2006
CLERK OF THE STATE

IN HOUSE OF REPRESENTATIVES
JUN 1 3 2006
THE COMMITTEE ON FINANCE
RECOMMEND THE PASSAGE
OF THIS BILL IN "AN SUBSTITUTE A"
AND THAT THE BILL BE APPROPRIATION
OF THE ORIGINAL BILL
FOR THE COMMITTEE

IN THE HOUSE OF REPRESENTATIVES
RECEIVED AND ORDERED
TO BE PLACED UPON THE
JUN 1 3 2006
CALENDAR
Clerk

IN THE HOUSE OF REPRESENTATIVES
READ & PASSED
AS AMENDED
JUN 1 9 2006
Clerk

IN THE SENATE
Referred to the Committee on
FINANCE
JUN 2 1 2006
Reading Clerk